**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **MELVIN WRIGHT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 2:05cv371-ID** |
| | ) | **(WO)** |
| **SANDERS LEAD CO., INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.  INTRODUCTION**

Before the court is a motion for summary judgment filed by Defendant Sanders

Lead Co., Inc. ("Defendant").  (Doc. No. 13.)  A brief and an evidentiary submission

accompany the motion.  (Doc. No. 14).  Plaintiff Melvin Wright ("Plaintiff") submitted a

memorandum brief in response and an evidentiary submission (Doc. No. 16) to which

Defendant filed a reply.  (Doc. No. 20.)  In this lawsuit, Plaintiff, an African-American,

alleges that he was terminated from his supervisory position with Defendant, while

another similarly-situated Caucasian employee was treated more favorably than he, and

that the only apparent reason for the disparity in treatment was Plaintiff's race.  Plaintiff

brings his discrimination claim pursuant to Title VII of the Civil Rights Act of 1964, 42

U.S.C. §§ 2000e-2000e-17 ("Title VII"), and 42 U.S.C. § 1981.

After careful consideration of the arguments of counsel, the relevant law and the

record as a whole, the court finds that summary judgment is due to be entered in

Defendant's favor on Plaintiff's Title VII/§ 1981 claim and that Plaintiff's state law claims are due to be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## II.  JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights jurisdiction), and 28 U.S.C. § 1367 (supplemental jurisdiction).  The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations of both.

## III.  STANDARD OF REVIEW

A court considering a motion for summary judgment must construe the evidence and make factual inferences in the light most favorable to the nonmoving party.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).  Summary judgment is entered only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  At this juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) (citations omitted).  This determination involves applying substantive law to the substantive facts that have been developed.  A dispute about a material fact is genuine if a reasonable jury could return a verdict for the nonmoving party, based on the applicable

2

law in relation to the evidence developed.  See id. at 248; Barfield v. Brierton, 883 F.2d 923, 933 (11th Cir. 1989).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact.  See Celotex, 477 U.S. at 323.  "[T]he burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Id. at 325.  The burden then shifts to the nonmoving party, which "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Summary judgment will not be entered unless the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.  See id. at 587.

## IV.  STATEMENT OF FACTS

Viewed in the light most favorable to Plaintiff, the following facts constitute the facts material to resolution of the instant motion for summary judgment.[1]

Plaintiff--an African-American--worked for Defendant at its plant in Troy, Alabama, from approximately 1976 until he was fired in February 2004.  Defendant is in

---

[1] When deciding a motion for summary judgment, the court views the facts and all reasonable inferences in favor of the nonmoving party.  See Celotex, 477 U.S. at 322. This statement of facts, thus, may not represent the actual facts.

the business of recycling lead acid storage batteries and employs more than 350 employees at its plant in Troy.  (Sanders Dep. at 24-25); (Compl. ¶¶ 2, 4, 5.)

At the time of his termination, Plaintiff was a second shift supervisor in Defendant's casting and alloy department, a position he had held since 1979.  (Pl. Aff. at 1); (Sanders Aff. ¶ 2.)  Plaintiff's direct supervisor for the 12 years preceding Plaintiff's termination was Edgar Fannin ("Fannin").  Fannin, in turn, was supervised by Plant Manager Bart Sanders ("Sanders"), who was "in charge [of] all physical operations" for Defendant.  (Fannin Dep. at 21-24, 27); (Sanders Aff. ¶ 2.)  Sanders is the individual "ultimately" responsible for all termination decisions.  (Sanders Dep. at 9-10.)  Fannin and Sanders are Caucasion.  (Fannin Dep. at 40-41.)

During Plaintiff's employment, Defendant's plant operated 24 hours a day, seven days a week.  (Id. at 28.)  Fannin's regular job hours were 8 a.m. to 5 p.m., while Plaintiff's shift commenced at 1:45 p.m. and continued until 9:45 p.m.  (Fannin Dep. at 26, 34); (Sanders Dep. at 47-48.)

At all relevant times to this lawsuit, Defendant had in place an 11-page employee handbook.  (See Employee Handbook (Ex. B to Doc. No. 16).)  The employee handbook contains, among other items, rules and corresponding sanctions applicable to Defendant's employees.  Defendant categorizes its rules as either "minor offenses," "major offenses" or "intolerable offenses."  (Id. at 9.)  Of relevance to this lawsuit are the following two "intolerable offenses":  (1) "[s]moking or using tobacco products inside the plant"; and (2) "[p]ossession of, bringing in, or using intoxicants or illicit drugs or narcotics

4

anywhere on company property."  (Id. at 11.)  The penalty for a "first offense" of an

"intolerable offense" is "discharge."  (Id.)

On February 5, 2004, Austin Turner ("Turner"), who at the time had been

employed for almost four years as a security guard for Defendant, observed two

employees, Travoris Green ("Green") and Buddy Whitman ("Whitman"), riding together

in one of Defendant's trucks.[2]  (Turner Aff. ¶¶ 2, 3); (Turner Dep. at 14-15.)  Turner

decided to follow them because he assessed that Green, who works in the casting and

alloy department, had no legitimate business reason to be riding in one of Defendant's

trucks which was used by employees in the shipping department.  (Turner Aff. ¶ 3);

(Turner Dep. at 17.)  When Turner located Green and Whitman, the truck was "parked in

the back of the truck lines," and Green and Whitman were smoking cigarettes.  (Turner

Aff. ¶ 3); (Turner Dep. at 18.)  Turner reprimanded Green for being out of his work area.

(Turner Aff. ¶ 3.)

Turner, who was in a security vehicle, followed Green and Whitman back to the

plant and to a loading dock.  (Turner Aff. ¶ 4); (Turner Dep. at 18-19.)  At the loading

dock, Turner directed Green and Whitman to empty their pockets.  (Turner Aff. ¶ 4);

(Turner Dep. at 19.)  Each produced a pack of cigarettes and a lighter.  (Turner Aff. ¶ 4.)

Turner confiscated the two cigarette packs, and Green and Whitman returned to work.

_____

[2] Turner and Whitman are Caucasian.  (Fannin Dep. at 40); (Sanders Dep. at 36.)
Green is African-American.  (Sanders Dep. at 36.)

5

When Turner reached the security office, he called Whitman's supervisor, Jim Stinson ("Stinson"), who was at home, and informed Stinson that he had caught Whitman smoking.[3] (Turner Dep. at 20.) Turner also called Plaintiff, who was Green's supervisor.[4] Apparently, though, Turner was unable to reach Plaintiff at that time because Plaintiff was on the "work site," and not in his office. (Pl. Aff. at 2.) Consequently, another supervisor, Johnny McClendon ("McClendon"), informed Plaintiff that Turner had called concerning Green. McClendon, who had learned from Turner what had transpired, advised Plaintiff that Green "would lose [his] job," but that Plaintiff should consult first with Fannin before taking any action. (Id.)

Approximately 10 minutes after his conversation with McClendon, Plaintiff talked to Turner by telephone. Turner informed Plaintiff that he had "caught" Green and Whitman smoking in the "trucks scale area." (Id.) Guessing that Green was still in that area which was "quite a distance" from Plaintiff's location, Plaintiff asked Turner if Turner would "work with [him]." (Id.) In his affidavit submitted in opposition to Defendant's summary judgment motion, Plaintiff explains that "all [he] meant" when he asked Turner to "work with [him]" was that Plaintiff wanted "some time" to complete the job task he was in the middle of performing and to discuss the situation with Green. (Id.)

---

[3] Stinson is Caucasian. (Compl. ¶ 14.)

[4] Green was transferred from another of Defendant's departments to the casting and alloy department and had been under Plaintiff's supervision for three days prior to the incident in question. (Pl. Aff. at 3.)

Turner, on the other hand, says that Plaintiff asked Turner if he [Turner] "could do the right thing and let [] Green slide this time." (Turner Aff. ¶ 6.)  Turner, however, said that he informed Plaintiff that he "could not do that." (Id.)

"Later" that day, Turner called Plaintiff again and asked Plaintiff to meet him at the guard station, and Plaintiff complied. (Pl. Aff. at 3.)  Turner showed Plaintiff the packet of cigarettes he had confiscated from Green. (Id. at 3); (Pl. Dep. at 60, 63-64.)  In addition to cigarettes, a "brown cigar" was inside the packet. (Pl. Aff. at 3); (Pl. Dep. at 63-64.)  Turner broke apart the cigar, and both Turner and Plaintiff concurred that it smelled like marijuana. (Pl. Aff. at 3); (Pl. Dep. at 63-64.)

At that time, Plaintiff says that he returned to his work area and filled out a "change of status" form, terminating Green's employment.  Plaintiff then advised Green that, "[a]s for now, you don't have a job," and instructed the employee working in the guard shack that Green "was on his way" out of the plant. (Pl. Dep. at 64-65, 68-70); (see also Sanders Dep. at 58.)  Also, on February 5, after Plaintiff completed the paperwork, he called Fannin, who was off duty and away from the plant, and advised Fannin of what had occurred regarding Green, including Green's possession of marijuana on the work site. (Pl. Dep. at 66-68.)  Fannin directed Plaintiff to "get the paperwork" and "write him [Green] up," and Plaintiff informed Fannin that he already had completed

the documentation.  (Id. at 68.)  The next morning, Fannin "had" the paperwork which

Plaintiff had completed on Green.[5]  (Fannin Dep. at 34-35.)

The next day, on February 6, when Plaintiff returned to Defendant's plant to begin

his 1:45 p.m. shift, the security officer at the front gate denied Plaintiff entrance to the

plant.  (Pl. Aff. at 3.)  Plaintiff turned around in his vehicle in search of the nearest

payphone which he found at a nearby grocery store.  (Id. at 4.)  There, Plaintiff called

Fannin and asked why he was not permitted to report to work.  (Id.)  Fannin relayed that

Turner had accused Plaintiff of trying to get him to "sweep something under the rug"

pertaining to Green.  (Id.)  Fannin, though, assured Plaintiff that he would "straighten[]

out" everything.  (Id.)  This phone call occurred on a Friday.

The following Monday, on February 9, Plaintiff attempted to call Sanders because

he had not heard anything from Fannin.  Plaintiff was told that Sanders was "getting

ready to have a meeting" concerning Plaintiff and that Sanders would contact Plaintiff

later.  (Id.)  The next day, still not having received any communication from Sanders or

Fannin, Plaintiff called Fannin again.  Fannin told Plaintiff that he thought he had

"things" worked out for Plaintiff.  (Id.)  Plaintiff, however, did not hear back from

Fannin, so on February 11, 2004, Plaintiff mailed a certified letter to Sanders

---

[5] Green confirms that Plaintiff fired him on February 5, 2004.  (Green Aff. at 1.)
Green attests that, the next day, he tried to convince Fannin to "override" Plaintiff's
decision, but that Fannin would not budge.  (Id.)  Green admits that he was smoking
cigarettes on the day in question.  (Id.)  He adds:  "The reason I was riding with Buddy
Whitman was to test the drug he was selling me," and "we went down to the truck lines to
make the transaction."  (Id.)

"request[ing] that [he] be given an opportunity to tell [his] side" of the story to defend against the "untrue allegations" and be permitted to return to his job.  (Id. at 5.)  Sanders received the letter, but did not respond.  (Sanders Dep. at 49.)  Rather, on February 12, Sanders apparently had Fannin call Plaintiff.  Fannin informed Plaintiff that Sanders "could not use [him] anymore."  (Pl. Aff. at 5.)  Fannin, though, did not provide any "specific reason[]" as to why Plaintiff was being terminated.  (Id.)  Although Plaintiff asked Fannin on several occasions if he could speak with Sanders, Fannin denied the requests.  (Id.)

From Defendant's perspective, the following constitutes the events which preceded Plaintiff's termination.  On February 5, 2004, Turner informed his direct supervisor that Plaintiff had "asked [him] to overlook [] Green's rules violations."  (Turner Aff. ¶ 7.)  As a result, the next day, on February 6, Turner met with Sanders and informed him of the same.  Specifically, Sanders learned from Turner that, after Turner "informed [Plaintiff] that [] Green was smoking on company property and was in possession of marijuana, [Plaintiff] later called him . . . and asked him [Turner] if he could 'do the right thing' and not report [] Green's misconduct."  (Sanders Aff. ¶ 6.)  Upon learning this information from Turner, Sanders "suspended" Wright, effective February 6, 2004, "pending further investigation of the incident."  (Id.)  Sanders consulted "some more" with Fannin,

McLendon, Turner, and Turner's supervisor, and, thereafter, decided to terminate

Plaintiff's employment.[6]  (Id.); (Sanders Dep. at 26-28.)

> Sanders states:
>
> I terminated [Plaintiff's] employment because I believed he tried to cover up
> [] Green's serious rules violations of not being in his assigned work area,
> smoking on company property, and being in possession of illegal drugs on
> company property.  Mr. Wright attempted to hide Mr. Green's misconduct
> from me and other upper management at Sanders Lead.  Therefore, I lost
> confidence in Mr. Wright's judgment, basic honesty, and ability to run a
> shift.  I simply could not trust Mr. Wright to represent the company's
> interests any more.

(Sanders Aff. ¶ 7); (Sanders Dep. at 28-29, 41.)

Sanders explained that Plaintiff, as a supervisor, is held to a "different standard"

than Defendant's hourly employees because supervisors are required to "represent the

company's interest."  (Sanders Dep. at 61.)  Sanders attests that he had never received

information that another supervisor had "attempt[ed] to cover up a subordinate's rules

violations."  (Sanders Aff. ¶ 10.)

Whitman, like Green and Plaintiff, also was terminated.  Sanders attests that he

fired Whitman "for smoking with [] Green."  (Sanders Aff. ¶ 9); (Pl. Dep. at 103.)

Whitman, though, was "rehired" approximately six weeks later.  (Sanders Dep. at 35-36,

38-39, 62.)  When Whitman was fired, he worked in the shipping department in a non-

supervisory position.  He, however, was rehired as a baghouse technician in the furnace

---

[6] Sanders states that he "used" these individuals "to feed information to [him]," so
that he could make a decision as to whether fire Plaintiff.  (Sanders Dep. at 29.)

10

department.  (Id. at 62-63.)  Although he remained an hourly wage earner in his new

position, Whitman had limited supervisory duties and earned more per hour than he did

when he worked in the shipping department.  (Id. at 62-65.)

Sanders said that he allowed Whitman to return to work because Whitman begged

"numerous times" to come back and "swore up and down" that he would abide by the

company rules.  (Id. at 65.)  Sanders explained that it was "a standard happening" for

Defendant to rehire workers and that Green "was on his third rehire" when he was fired

on February 5, 2004.  (Id. at 66.)  Sanders also stated that he never foreclosed the

possibility of rehiring Plaintiff, but that Plaintiff never asked to come back to work.[7]  (Id.

at 66.)  Sanders, however, did make clear that he would not have rehired Plaintiff as a

supervisor.  (Id.)

After receiving a right-to-sue letter from the Equal Employment Opportunity

Commission ("EEOC"), Plaintiff timely filed this lawsuit on October 8, 2004, seeking

---

[7] The court notes that, for summary judgment purposes, the court accepts
Plaintiff's statement that, in his certified letter to Sanders (which incidentally is not part
of the record), Plaintiff requested that Sanders permit him to return to Defendant's
employ.  To the extent that Plaintiff's evidence creates a dispute as to whether Plaintiff
requested to rejoin Defendant's workforce, the dispute, as revealed later in this opinion, is
not material to resolution of the present motion for summary judgment.  See, e.g.,
Valance v. Wisel, 110 F.3d 1269, 1274-75 (7th Cir. 1997) ("The existence of a factual
dispute will not preclude summary judgment if the disputed fact is not material--that is, if
resolution of the factual dispute would not affect the outcome of the suit under governing
law.").

redress from Defendant for his termination.[8]  (See Compl. ¶ 3.)  Plaintiff's Complaint

contains three counts.  Count 1 alleges a claim of discriminatory discharge based on race,

in violation of Title VII/§ 1981.  (See id. ¶¶ 42-49.)  Counts 2 and 3 allege state law

claims for wrongful discharge and misrepresentation.  (See id. ¶¶ 50-60.)  Plaintiff

requests declaratory relief, reinstatement, front pay, back pay, compensatory damages,

punitive damages, costs and attorneys' fees.  (Id. at 9.)  Defendant moves for summary

judgment on all claims in the Complaint.


## V.  DISCUSSION

### A.  Title VII

Title VII provides, in pertinent part, that "[i]t shall be an unlawful employment

practice for an employer . . . to discharge any individual . . . because of such individual's

race."  42 U.S.C. § 2000e-2(a).  "[A]n unlawful employment practice is established when

the complaining party demonstrates that race . . . was a motivating factor for any

employment practice, even though other factors also motivated the practice."  42 U.S.C.

---

[8] Defendant has not challenged Plaintiff's allegations in the Complaint that Plaintiff
fulfilled the jurisdictional requirements for filing a Title VII lawsuit.  (Compl. ¶ 3); see
Forehand v. Florida State Hosp. at Chattahoochee, 89 F.3d 1562, 1567 (11th Cir. 1996)
("Before instituting a Title VII action in federal district court, a private plaintiff must file
an EEOC complaint against the discriminating party and receive statutory notice from the
EEOC of his or her right to sue the respondent named in the charge.").  The court,
therefore, finds that, for purposes of ruling on the instant summary judgment motion,
these Title VII prerequisites have been satisfied.

§ 2000e-2(m).  In this lawsuit, Plaintiff contends that his race was "a motivating factor" for his termination, in violation of Title VII.  (Pl. Resp. at 4 (Doc. No. 16).)

An employee may prove that race was an impermissible motivating factor by either direct or circumstantial evidence.  See Hall v. Alabama Ass'n of School Boards, 326 F.3d 1157, 1165 (11th Cir. 2003) (per curiam).  There is no direct evidence of racial discrimination in this case, and Plaintiff has not argued otherwise.  (See Pl. Resp. at 8 (Doc. No. 16)); see also Cooper v. Southern Co., 390 F.3d 695, 724 n.15 (11th Cir. 2004) ("direct evidence is encountered only infrequently, since direct evidence 'is composed of only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor'") (citation omitted).

The allocation of proof in cases where a plaintiff relies on circumstantial evidence of discrimination, as here, shifts in accordance with the three-step order of proof established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1972).  In the first McDonnell Douglas phase, the plaintiff must produce evidence sufficient to make out a prima facie case, thus giving rise to a presumption that the employer unlawfully discriminated against him or her in taking the alleged adverse employment action.  See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).  Next, the employer must rebut this presumption by producing evidence that the negative employment action was motivated instead by a legitimate, nondiscriminatory reason.  Id. at 509.  The employer's "burden is one of production, not persuasion; 'it can involve no credibility assessment.'" Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's

13

Honor Center, 509 U.S. at 509).  Finally, to avoid summary judgment, the plaintiff must respond with evidence, which may include previously produced evidence establishing a prima facie case, which would allow a reasonable jury to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.  See Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997); see also Reeves, 530 U.S. at 143.  "The result of this three step dance is that the burden is always on plaintiff to show that defendant's action is discriminatory."  Morris v. Emory Clinic, Inc., 402 F.3d 1076, 1081 (11th Cir. 2005) (per curiam).

To establish a prima facie case of discriminatory discharge, involving Defendant's alleged racial animus in disciplining employees for violations of work rules, Plaintiff must show the following: (1) that he is a member of a protected class; (2) that he was qualified for the job; (3) that he suffered an adverse employment action; (4) that he "has engaged -- either (a) disputedly or (b) admittedly -- in misconduct similar to persons outside the protected class"; and (5) "that similarly situated nonminority employees (that is, persons outside the protected class) received more favorable treatment."[9]  Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1311 n.6 (11th Cir.), modified on other grounds on denial of reh'rg, 151 F.3d 1321 (11th Cir. 1998); Lathem v. Dep't of Children

_____

[9] Plaintiff can circumvent the "similarly situated" prong by demonstrating instead that he was replaced by someone outside of his protected class.  See Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dept. of Educ. ex rel. Univ. of S. Fla., 342 F.3d 1281, 1289 (11th Cir. 2003).  It is undisputed, however, that Plaintiff's position was filled by another African-American employee (Sanders Aff. ¶ 8); thus, an inference of racial discrimination cannot arise from this act.

and Youth Servs., 172 F.3d 786, 792 (11th Cir. 1999); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).

It is undisputed that Plaintiff, an African-American, satisfies the first element.  It also is undisputed that Plaintiff suffered an adverse employment action when he was terminated so as to meet the third element.

Regarding the second element, Defendant argues that Plaintiff cannot prove that he "remained qualified" for the position of second shift supervisor subsequent to Sanders' "belief" that Plaintiff "attempted to cover up [] Green's rules violations."  (Def. Br. at 16-17 (Doc. No. 14).)  The reason advanced by Defendant in support of its assertion that Plaintiff is unqualified is the same reason relied upon by Defendant to justify Plaintiff's termination.  In Holifield, the Eleventh Circuit warned against using the employer's rationale for the discharge to prevent an employee from proving a prima facie case.  See 115 F.3d at 1562 n.3 (holding that where issue of plaintiff's "job performance is intertwined with the issue of whether his termination was pretextual, his job performance will not be examined until a later stage in the McDonnell Douglas analysis"); see also Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1360 (11th Cir. 1999) (holding that in cases where a plaintiff has worked in a position "for a significant period of time," plaintiff's qualification for that position can be inferred for purposes of the prima facie case); Mora v. Univ. of Miami, 15 F. Supp.2d 1324, 1334 (S.D. Fla. 1998) ("An employee is qualified for a position, if the employee's work was satisfactory prior to the date of the alleged adverse employment action."), aff'd without

and Youth Servs., 172 F.3d 786, 792 (11th Cir. 1999); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).

It is undisputed that Plaintiff, an African-American, satisfies the first element.  It also is undisputed that Plaintiff suffered an adverse employment action when he was terminated so as to meet the third element.

Regarding the second element, Defendant argues that Plaintiff cannot prove that he "remained qualified" for the position of second shift supervisor subsequent to Sanders' "belief" that Plaintiff "attempted to cover up [] Green's rules violations."  (Def. Br. at 16-17 (Doc. No. 14).)  The reason advanced by Defendant in support of its assertion that Plaintiff is unqualified is the same reason relied upon by Defendant to justify Plaintiff's termination.  In Holifield, the Eleventh Circuit warned against using the employer's rationale for the discharge to prevent an employee from proving a prima facie case.  See 115 F.3d at 1562 n.3 (holding that where issue of plaintiff's "job performance is intertwined with the issue of whether his termination was pretextual, his job performance will not be examined until a later stage in the McDonnell Douglas analysis"); see also Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1360 (11th Cir. 1999) (holding that in cases where a plaintiff has worked in a position "for a significant period of time," plaintiff's qualification for that position can be inferred for purposes of the prima facie case); Mora v. Univ. of Miami, 15 F. Supp.2d 1324, 1334 (S.D. Fla. 1998) ("An employee is qualified for a position, if the employee's work was satisfactory prior to the date of the alleged adverse employment action."), aff'd without

op., 189 F.3d 485 (11th Cir. 1999).  Relying on the foregoing principles, the court finds

that, for purposes of establishing his prima facie case, Plaintiff need only demonstrate

that, prior to the incident in question, he was qualified for his position.

Although Defendant has been slightly critical of Plaintiff's job performance,

Defendant has not refuted that Plaintiff performed his job in such a manner that, had

Plaintiff not engaged in the alleged offending conduct, Defendant would have allowed

Plaintiff to continue his employment in a supervisory position.[10]  Accordingly, in the

context of the prima facie case, the court finds that Plaintiff has shown that he was

qualified for the position he held as second shift supervisor up until the point of the

offending conduct.  Plaintiff, thus, satisfies the second prima facie element.

Turning to the fourth prima facie element, Plaintiff denies that he is guilty of

trying to cover up Green's rules violations.  The Eleventh Circuit, however, has made

clear that a plaintiff cannot demonstrate a prima facie case with proof that he or she did

not commit the alleged infraction.  Jones, 137 F.3d at 1311 n.6 ("We stress that . . . no

plaintiff can make out a prima facie case by showing just that she belongs to a protected

class and that she did not violate her employer's work rule.").  The fourth element

---

[10] During his deposition, Fannin, Plaintiff's direct supervisor, did not have any
specific complaints about Plaintiff's job performance.  Fannin explained that Defendant
did not have in place any "official" evaluations for supervisors to complete regarding
their subordinates' job performances.  (Fannin Dep. at 25.)  Fannin's subjective
assessment of Plaintiff's job performance was that Plaintiff was a "fair" worker with
"good" job knowledge, but that he would give Plaintiff a "lesser score" than "good"
regarding Plaintiff's fulfillment of job duties.  (Id.)  Sanders also described Plaintiff as "a
reasonably good employee."  (Sanders Dep. at 83.)

expressly takes into consideration that a plaintiff may dispute that he or she violated the work rule.  See Smith v. Int'l Paper Co., 160 F. Supp.2d 1335, 1349 (M.D. Ala. 2001).  As "stressed" by the Eleventh Circuit, a plaintiff "must also point to someone similarly situated (but outside the protected class) who disputed a violation of the rule and who was, in fact, treated better."  Jones, 137 F.3d at 1311 n.6.

The similarly-situated component of the prima facie case, as embodied in the fourth and fifth elements above, is where Defendant focuses its argument.  Defendant contends that Plaintiff has not demonstrated that any other employee, outside of Plaintiff's protected class, was accused of similar misconduct or that it treated similarly-situated, non-African-American employees more favorably than Plaintiff.  (Def. Br. at 11-16 (Doc. No. 14).)  Defendant asserts that a similarly-situated employee in this case would be a supervisor of a different race whom Sanders also believed had attempted to cover up a subordinate's multiple rules violations.  (Id. at 14-16.)  Defendant, however, asserts that there is no such employee.

Plaintiff, on the other hand, argues that a Caucasian employee – Whitman – is similarly situated to him.  (Pl. Resp. at 6 (Doc. No. 16).)  Although initially Whitman was fired, Plaintiff contends that Whitman ultimately was treated more favorably because, notwithstanding the fact that Whitman committed a terminable offense, he regained employment with Defendant a mere six weeks later, yet Plaintiff did not.  (Id. at 5-6.)  For the reasons to follow, the court disagrees with Plaintiff.

To establish the similarly-situated prong of the prima facie case, the employee bears the burden of demonstrating that he or she was treated differently than a similarly-situated employee outside of his or her protected class.  To carry this burden, an employee must show that the proposed comparator was "similarly situated in all relevant respects."  Holifield, 115 F.3d at 1562.  Although the comparator need not be "identically situated," id., an employee cannot prevail simply by proffering generic similarities in the misconduct.  The "quantity and quality of the comparator's misconduct [must] be nearly identical to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges."[11]  Maniccia v. Brown, 171 F.3d 1364, 1368-69 (11th Cir. 1999); see also Silvera v. Orange County Sch. Bd., 244 F.3d 1253, 1259 (11th Cir. 2001).

A "similarly-situated" employee is one who was "subject to the same standards" as Plaintiff and "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  Anderson v. Twitchell-A-Tyco, 76 F. Supp.2d 1279, 1286 (M.D. Ala. 1999) (quoting Malladi v. Brown, 987 F. Supp. 893, 909 (M.D. Ala. 1997)).  For purposes of

---

[11] As recognized in a recent, albeit unpublished, opinion of the Eleventh Circuit, the panel in Alexander v. Fulton County, Ga., 207 F.3d 1303, 1334 (11th Cir. 2000), "called into question" the "nearly identical" requirement.  Burke-Fowler v. Orange County, Fla., No. 05-14899, 2006 WL 770638, *2 n.2 (11th Cir. March 27, 2006).  The Eleventh Circuit in Burke-Fowler, however, noted that it was "bound to follow Maniccia's 'nearly identical' standard rather than the standard articulated in Alexander because when a later panel decision contradicts an earlier one, the earlier panel decision controls."  Id. (citing Walker v. Mortham, 158 F.3d 1177, 1188-89 (11th Cir. 1998)).  Herein, the court has applied the "nearly identical" standard, but notes that its findings would be the same even under the less stringent standard set forth in Alexander, supra.

the prima facie showing, "[t]he most important factors in the disciplinary context are the nature of the offenses committed and the nature of the punishments imposed." Maniccia, 171 F.3d at 1368.  Where the plaintiff and the proposed comparator are not similarly situated, an employer's decision to impose different punishment on each does not raise an inference of illegal discrimination.  See Lathem, 172 F.3d at 793.

In light of the foregoing principles, the court finds that Whitman is not similarly situated to Plaintiff.  Initially, the court observes that Plaintiff's reverberating argument is that both Plaintiff and Whitman "broke a rule," but that Whitman was "disciplined more leniently and treated more favorably."  (Pl. Resp. at 6 (Doc. No. 16).)  The court, however, finds that to fashion the comparison at this level of generality results in too broad a comparison for purposes of establishing a similarly-situated individual.  See, e.g., Bates v. Greyhound Lines, Inc., 81 F. Supp.2d 1292, 1300-01 (N.D. Fla.), aff'd without op., 239 F.3d 369 (11th Cir. 2000) (providing analysis of specificity required to meet similarly-situated prong); Richardson v. Newburn Enlarged City Sch. Dist., 984 F. Supp. 735, 746 (S.D.N.Y. 1997) ("The level of generality at which [plaintiff] attempts to compare the various instances of misconduct –i.e., 'poor judgment'– is contrary to case law and would render disparate treatment analysis meaningless."); Raybon v. Alabama Dep't of Pub. Safety, Civ. A. No. 00-D-391-N, 2001 WL 611194, *4 (M.D. Ala. April 19, 2001) (rejecting employees' contention as overbroad that other employees who engaged in "generic moral and ethical misconduct" were similarly-situated state troopers).

19

Whitman's conduct is distinct from Plaintiff's alleged conduct which resulted in Plaintiff's termination.  Whitman was disciplined for smoking on company property and being in possession of tobacco products, while Plaintiff was fired because Defendant believed that Plaintiff tried to cover up work rules violations committed by his subordinate, Green.  Whitman's violation did not involve dishonesty, and Plaintiff's infraction did not involve the use or possession of a tobacco product on company premises.  Factually, the infractions are as different as apples and oranges.  Substantive differences in employee misconduct show that the employees are not similarly situated for purposes of comparing disciplinary sanctions.  An employer "may believe, without violating Title VII, that there is a qualitative difference between various acts of misconduct."  Raybon, 2001 WL 611194, *4.

Moreover, there is evidence that Defendant had different expectations of supervisors and hourly employees.  Namely, Sanders testified that Whitman, an hourly employee, was not held to as high a standard as Plaintiff, who as a supervisor, was expected to represent the interest of the company.  (Sanders Dep. at 61.)  Plaintiff and Whitman, thus, are not similarly situated for the additional reason that they were held to

20

different standards of conduct.  The court, therefore, concludes that Whitman is not a valid comparator.[12]

At this juncture, it is appropriate for the court to observe that it has not overlooked Sanders' testimony that, unlike Whitman's conduct, Plaintiff's alleged infraction was not expressly covered by one of Defendant's written rules in the employee handbook. (Sanders Dep. at 31-32, 39-40); (Employee Handbook at 11.)  This fact, however, does alter the court's conclusions herein.  As testified by Sanders, Plaintiff was tasked with the responsibility of reporting to his superiors any rules violations committed by his subordinates.  (Sanders Aff. ¶ 3.)  Plaintiff's alleged failure to meet job expectations, even absent a disciplinary rule directly addressing the same, "is not evidence of a lack of offense but more appropriately evidence of an expectation of professionalism.  There is no legal principle that limits matters for which an employee may be subject to discipline only to those that are specifically proscribed by company policy."  Early v. Morris Newspaper Corp., 54 F. Supp.2d 1261 (M.D. Ala. 1999) (brackets added).

---

[12] Defendant contends that Plaintiff also has proffered Stinson as a comparator. The court does not necessarily agree with Defendant that, in his brief, Plaintiff makes this comparison.  (See, e.g., Pl. Resp. at 5, 8-9 (Doc. No. 16).)  Nonetheless, for the sake of thoroughness, the court observes that there is a stark contrast between Plaintiff and Stinson for comparator purposes.  Although Stinson, like Plaintiff, was a supervisor, there is absolutely no evidence in the record that Stinson actually or allegedly covered up a subordinate's misconduct.  There is no evidence that Sanders ever had received information that Stinson had asked Turner or anyone else to "cover up" a rules violation by a subordinate.  Plaintiff simply does not stand on equal or comparable footing with Stinson.

Based on the foregoing, the court finds that Plaintiff has failed to identify an employee whose alleged infraction parallels the misconduct of which Plaintiff was accused, but who was treated more favorably.  Unfair discipline, absent any evidence from which racial animosity can be inferred, is not an unlawful employment practice which violates Title VII.  The same observations made by the Eleventh Circuit in <u>Abel v. Dubberly</u> apply in this case:

> Although termination may, to some, seem a draconian response given the level of the Plaintiff's offense, the reasonableness of [Defendant's] disciplinary policies are not a consideration.  As we have said before, an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason."

210 F.3d 1334, 1339 n.5 (11th Cir. 2000) (per curiam) (quoting <u>Nix v. WLCY Radio/Rahall Communications</u>, 738 F.2d 1181, 1187 (11th Cir. 1984)).

In sum, Plaintiff has not "offer[ed] any evidence sufficient to show that []he was similarly situated to any other employee, and absent some other similarly situated but differently disciplined worker, there can be no disparate treatment."[13]  <u>Id.</u> at 1339. Because Plaintiff has failed to establish a prima facie case of discrimination, the court

---

[13] The court notes that Plaintiff cites Eleventh Circuit opinions which provide that the prima facie case is not "rigid or inflexible," <u>Schoenfeld v. Babbitt</u>, 168 F.3d 1257, 1268 (11th Cir. 1997), and may be proved by any "other [circumstantial] evidence" from which a discriminatory animus may be inferred.  <u>Holifield</u>, 115 F.3d at 1562 (brackets added); (<u>see</u> Doc. No. 16 at 8.)  The court, however, carefully has examined all of the evidence in the record and is not persuaded that such "other evidence" exists in this case.

need not reach the issue of pretext to grant Defendant's motion for summary judgment on

Plaintiff's Title VII discriminatory discharge claim.


B. 42 U.S.C. § 1981

Plaintiff also contends that Defendant's actions violated 42 U.S.C. § 1981.  The

same standards governing liability under Title VII apply to § 1981 claims.  See Turnes v.

AmSouth Bank, 36 F.3d 1057, 1060 (11th Cir. 1994); Waldemar v. Am. Cancer Soc'y, 971

F. Supp. 547, 553 (N.D. Ga. 1996) ("Because . . . race discrimination claims under 42

U.S.C. § 1981 follow the same analysis as Title VII claims, the Court treats both claims

together.").  Because the court has concluded that Plaintiff is unable to prove his theory

of disparate treatment under Title VII, his § 1981 claim fails as well.  Summary judgment,

therefore, is due to be entered in favor of Defendant on Plaintiff's § 1981 claim.


C. Supplemental State Law Claims

Plaintiff also alleges supplemental state law claims for wrongful discharge and

misrepresentation.  Having dismissed the federal claims, the court in its discretion

declines supplemental jurisdiction over these remaining state law claims.  See 28 U.S.C.

§ 1367(c)(3); see also McCulloch v. PNC Bank, Inc., 298 F.3d 1217, 1227 (11th Cir.

2002).  Defendant's motion for summary judgment on the state law claims, therefore, is

due to be denied as moot, and the state law claims are due to be dismissed without

prejudice.  See 28 U.S.C. § 1367(c)(3) & (d).

## VI.  ORDER

Based on the foregoing, it is CONSIDERED and ORDERED as follows:

(1) Defendant's motion for summary judgment (Doc. No. 13) be and the same is hereby GRANTED to the extent that Plaintiff's Title VII/§ 1981 discriminatory discharge claim in Count 1 of the Complaint is hereby DISMISSED with prejudice; and

(2) Defendant's motion for summary judgment be and the same is hereby DENIED as moot on Plaintiff's supplemental state law claims in Counts 2 and 3 of the Complaint and said state law claims are hereby DISMISSED without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

A judgment in accordance with this Memorandum Opinion and Order shall be entered separately.

DONE this 7th day of April, 2006.

/s/ Ira DeMent
SENIOR UNITED STATES DISTRICT JUDGE